United States District Court
Southern District of Texas
**ENTERED**
March 02, 2021
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| WALTON CUDE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 2:19-cv-00388 |
| | § | |
| AEP TEXAS INC., | § | |
| | § | |
| Defendant. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Defendant AEP Texas Inc. ("AEP") moves to exclude expert testimony by a master electrician in this tort case involving a residential fire. Plaintiff Walton Cude proffered the master electrician's testimony pursuant to Rule 702 of the Federal Rules of Evidence to support his claim that AEP's negligence in the delivery of electricity caused the fire that burned his home. AEP contends the testimony falls short of Rule 702's requirements because the master electrician is not qualified to speak to the issue of causation and his testimony overall is not reliable. After reviewing the Motion, the Response, the record and the applicable law, the Court is of the opinion that the Motion should be **GRANTED**.

I.     **BACKGROUND**

Cude's home burned to the ground around 4 a.m. on November 19, 2017. (Dkt. No. 13 at 1). On November 12, 2019, Cude filed a lawsuit in Texas state court alleging that AEP's negligence in providing electricity to his home caused the fire. (Dkt. No. 1-3 at 3). AEP timely removed the case to federal court, and the parties engaged in discovery. (Dkt. Nos. 1, 5). On August 3, 2020, Cude designated Bill Winkfein as a non-retained testifying expert witness. (Dkt. No. 8). Attached to this designation were two written reports purporting to be prepared by Winkfein. (Dkt. Nos. 8-1, 8-2). Both reports were actually prepared by Cude, and Winkfein only

"skimmed" them before signing.  (Dkt. No. 13-1 at 32, 37, 41).  Both parties deposed Winkfein on

October 30, 2020.  (Dkt. No. 13-1).  AEP also designated two experts, both of whom submitted

reports refuting Winkfein's conclusions and challenging his investigative methodology.  (Dkt.

Nos. 13-4, 13-5).

AEP filed the instant Motion to Exclude the Expert Testimony of Plaintiff's Expert on

December 2, 2020.  (Dkt. No. 13).  After full briefing on the issues at hand, (Dkt. Nos. 14, 15),

this Motion is ripe for adjudication.

### A.    BILL WINKFEIN'S QUALIFICATIONS , THEORIES, AND CONCLUSIONS

Winkfein is a retired master electrician with over thirty years' experience in the electrical

industry.  (Dkt. No. 13-1 at 3–4; Dkt. No. 14 at 3).  Specifically, he claims to have "experience,

education, training, and background in electrical equipment, residential and commercial wiring,

electrical transmission, and national electrical code and NFPA requirements."[1]  (Dkt. No. 8 at 1).

He also lays claim to a bachelor's and master's degree in electrical engineering.[2]  (Dkt. No. 8-2 at

1).  But after working just three months as an engineer, Winkfein pivoted and spent his career as

an electrician.  (Id.; Dkt. No. 13-1 at 47).  In that capacity he earned his Master Electrician License,

a pinnacle certification that required him to pass a test on the National Electrical Code, a Law and

Business Test, and a Lineman's Test, among other requirements.  (Dkt. No. 8-2 at 1).  As a master

electrician, Winkfein compiled a long and impressive resume demonstrating he has wired

numerous important pieces of equipment and buildings, such as space shuttle devices for NASA,

power plants, colleges, hospitals, and prisons.  (Id.).  Notably, Winkfein was never trained in nor

---

[1]    As will be discussed below, the extent of Winkfein's knowledge of the "national electrical code and NFPA requirements" was challenged and found wanting in important ways during his deposition.

[2]    To date, Winkfein has supplied neither AEP nor the Court with a copy of his diplomas.  (Dkt. No. 13 at 5).

worked as a fire cause and origin inspector.  Neither has Winkfein ever worked for a utility company.  His certification nevertheless permits him to install "transformers," such as the one involved in this case, and he claims he has experience doing so numerous times in commercial settings.  (Dkt. No. 13-1 at 4–5).

Winkfein also happens to be a personal friend of Cude's.  (*Id.* at 8).  And, as it happens, Winkfein was the electrician whom Cude hired when he bought the house in 2011.  (Dkt. No. 13 at 2; Dkt. No. 13-1 at 3–5, 14).  At that time, Winkfein inspected Cude's entire house, "inside and out," and installed a new electrical panel, surge protection device, and home-side ground rod, among other things.  (Dkt. No. 8-2 at 1–2; Dkt. No. 13-1 at 34, 41–42).

In addition to providing electrical work to Cude's property, Winkfein inspected and replaced some of AEP's electrical utility equipment.  Namely, he inspected the existing meter panel outside Cude's home that had been installed by AEP and determined that the wires therein "showed signs of corona."[3]  (Dkt. No. 8-2 at 2).  To remedy this, Winkfein replaced the meter panel wires.  (*Id.*).  Doing so required him to disconnect and reconnect the meter panel to AEP's "triplex" wire—the line delivering power from AEP's pole to Cude's residence.[4]  (Dkt. No. 13-5 at 2).  Utility companies such as AEP are exclusively responsible for supplying, installing, and maintaining triplex.  (Dkt. No. 13-1 at 39, 40).

A few days after Cude's home burned in November 2017, Winkfein returned to Cude's residence, but this time to inspect the burnt remnants and determine the cause of the fire.  (Dkt. No. 8-2 at 2; Dkt. No. 13-1 at 35).  During his inspection, he discovered "a bunch of melted triplex"

---

[3]   One of AEP's experts explains that corona is "a high-voltage, air insulation break-down effect that does not occur at low secondary voltages on insulated conductors."  (Dkt. No. 13-5 at 9).

[4]   Triplex is a combination of three conductor wires, each covered by insulation, that deliver a utility company's power to a residence.  (Dkt. No. 13-1 at 16).

on Cude's driveway.  (Dkt. No. 13-1 at 19).  Winkfein observed that the insulation on AEP's

triplex melted and bonded the three conductors together.  (Dkt. No. 8-2 at 2–3; Dkt. No. 13-1 at

27).  Winkfein also spoke with firsthand witnesses to the fire—a neighbor, a firefighter, and Cude

himself—who each observed arcing and sparks coming from the triplex at some unspecified point

in time during the fire.  (Dkt. No. 13-1 at 22, 30).  As part of his inspection, Winkfein walked

through the ashes of Cude's property—although, he states, there was "nothing left" of it.  (*Id.* at

23).  From this investigation, Winkfein concludes that AEP's triplex was the origin of the fault

that led to Cude's property loss.  (*Id.* at 30; Dkt. No. 13-3 at 2).

Winkfein also posits a theory as to how the triplex faulted.  Apparently, AEP had replaced

the power pole right outside Cude's home two months prior to the fire.  (Dkt. No. 13-1 at 29–30).

But when AEP did so, Winkfein claims, it neglected to replace the triplex leading from that pole

to Cude's home and instead "pulled [the triplex] a little bit too tight."  (*Id.* at 29–30, 36).  Winkfein

believes that the combination of the age of the triplex, the fact that it was stretched too tightly, and

"gale force winds" on the night of the fire[5] caused the triplex to arc.  (*Id.* at 30, 40).

Winkfein's theory that the original fault occurred within AEP's triplex informs his theory

as to how Cude's home ultimately burned down.  According to Winkfein, on the night of the fire,

strong wind caused the worn and tightly stretched triplex to arc, sending "unceasing electricity" to

Cude's home.  (Dkt. No. 13-3 at 3; Dkt. No. 13-1 at 27).  And the arcing triplex then fell on Cude's

truck, which was parked in his driveway and eventually exploded.  (Dkt. No. 13-3 at 2).  The

"constant" surge of electricity running to Cude's home, says Winkfein, ran through Cude's home-

side ground rod, tripped the main breaker panel, and "burned up" the surge protector—that is, the

---

[5]     In direct contradiction with his second report, Winkfein conceded during his deposition that he
had "no idea" whether there were gale force winds on the night Cude's home burned.  (*Id.* at 40).

equipment Winkfein himself installed—and eventually led to the fire in Cude's home.  (Dkt. No. 13-1 at 41).  Notwithstanding his certainty that these events happened, Winkfein admits to having "no idea" what amount of current was flowing to Cude's home at that moment—which he concedes is knowable—because he never calculated it.  (*Id.* at 41).

Winkfein believes the electricity surging into Cude's home was "unceasing" and "constant" because the fuse within AEP's transformer was not working properly to "protect[]" his system.  (*Id.* at 19, 24, 42).  Had the transformer been protected—meaning "fused correctly"—it would have cut AEP's power flowing to Cude's residence when the triplex faulted initially.  (*Id.* at 19, 41, 50).  Winkfein is therefore convinced that the combination of the poor condition of AEP's triplex wire and the failure of AEP's transformer caused the fire that burned Cude's home.  (Dkt. No. 8-2 at 2; Dkt. No. 13-1 at 13, 21, 23, 39–40).

Winkfein is certain AEP's equipment failed for want of proper installation and maintenance.  (Dkt. No. 13-1 at 23).  To arrive at this conclusion, Winkfein relies upon standards delineated in the Lineman's & Cableman's Handbook ("LCH") and the National Electrical Code ("NEC").  (*Id.* at 24).  From these sources and his observations, Winkfein determines that AEP failed to have in place a functional transformer, "ground rod," or "ground wire."[6]  (*Id.* at 25).  Winkfein observed that the ground wire on AEP's transformer pole was "corroded" and also "the wrong size"—according to the standards set forth in the NEC.  (*Id.* at 13).  Winkfein appears ambivalent as to whether the condition and insufficient size of the ground wire played a role in the fire that burned Cude's home.  On one hand, Winkfein avers in his report that, had the ground wire been properly maintained and sized, it would have prevented Cude's home from burning.  (Dkt.

---

[6]    Note that the ground rod and wire to which Winkfein refers here are different than the home-side ground rod he installed years earlier.

No. 13-3 at 4).  But during his deposition, Winkfein reversed course, conceding that a properly functioning ground wire would not have helped protect Cude's house.[7]

Lastly, Winkfein's analysis purports to rule out the possibility the triplex arced as a result of a fault originating from *within* Cude's home.  Winkfein's reasoning for this conclusion is succinct: any internal fault or short originating in Cude's residence "would have tripped the [internal] breaker [panel]," that is, the one he installed in 2011.  (*Id.* at 27, 41).  In other words, Winkfein's determination that no internal electrical fault in Cude's residence could have damaged the triplex rests entirely upon his confidence in equipment he was responsible for installing.

### B.    AEP's Experts Challenge Winkfein's Conclusions, Methodology, & Theories

AEP submitted reports by two experts who arrived at conclusions contrary to Winkfein's. (Dkt. Nos. 13-4; 13-5).  The first expert, Ricardo Torres, a "Certified Fire Investigator," concluded after an investigation that the origin and cause of the fire was "undetermined."  (Dkt. No. 13-4 at 7).  Torres was nevertheless able to confirm from "physical evidence found within the debris" of the interior of Cude's home that "the fire originated *within* the Cude residence," and that no evidence indicated "that the fire originated outside of the structure" or that AEP's equipment was to blame in any way.  (*Id.* (emphasis added)).  By "physical evidence," Torres references "several copper conductors with arc damage" within the home.  (*Id.*).  The second expert, Don Russell, a forensic investigator and professor of electrical engineering, similarly concluded after an investigation that "[n]o error, omission, or action by AEP caused the subject fire."  (Dkt. No. 13-5 at  10).

---

[7]    Furthermore, as discussed below, Winkfein learned from AEP's counsel that the NEC's standards are inapplicable to utility companies.

Torres criticized Winkfein's investigatory methodology.  Namely, Torres avers that Winkfein erred by relying upon a mere "visual inspection of the residence after the fire event" instead of "a completed fire scene examination or investigation."  (Dkt. No. 13-4 at 8).  In other words, Torres contends, Winkfein "made no effort to follow any protocols for a properly conducted fire scene examination," and therefore, "no scientific conclusion can be made as to the origin and cause of the fire" based on his report.  (*Id.* at 9).  By "protocols," Torres means the National Fire Protection Association 921 Guide for Fire and Explosion Investigations ("NFPA 921"), which, he claims, is "the prevailing authority among fire investigators worldwide."  (*Id.* at 3).  In short, the NFPA 921 requires fire investigators to utilize a "systematic approach" in determining the origin of any fire by considering witness information, fire patterns, electrical arc mapping, and fire dynamics.  (*Id.*).  As an example of how Winkfein's methodology failed to use scientific protocols, Torres points out that "the physical evidence described by Mr. Winkfein," namely the melted triplex and melted aluminum from Cude's vehicle, is "normally found at just about any fire scene."  (*Id.* at 9).

Russell further refuted each of Winkfein's theories as to causation.  Regarding Winkfein's theory that the fault must have originated with the triplex because the triplex was damaged, Russell countered that Winkfein provided "no evidence or analysis or basis for his speculative claim that the heavy-duty triplex conductor was damaged *before* the fire."  (Dkt. No. 13-5 at 11 (emphasis added)).  In other words, Russell accuses Winkfein of basing his entire fire-origin theory upon a classic causal fallacy—that one event necessarily led to another when the converse could just as easily be true.  Russell further contends that Winkfein's theory that the triplex faulted because of overstretching is flawed.  For one thing, Russell states, "[i]t is virtually impossible to overstretch triplex conductor."  (*Id.* at 10–11).  But even if the triplex had been "overstretched," Russell

assumes, "there is no damage mechanism that would damage the internal wires [of the triplex] as Mr. Winkfein proposes." (*Id.* at 11). Russell therefore believes Winkfein's theory that overstretching contributed to the triplex's failure is built upon a "failure mechanism of triplex" that is not "known," and that Winkfein presents "no evidence that this actually occurred." (*Id.*). Assuming, however, that the fault originated in the triplex, Russell also disputes Winkfein's theory that this fault would have sent "unceasing electricity" to Cude's home. Rather, Russell avers that the surge would have "flow[ed] back to the transformer over the neutral wire, which is the path of least resistance and most direct path to the utility system." (*Id.*). And contrary to Winkfein's assertions, Russell explains that AEP's transformer *was* properly protected—by an "internal protection device" and "upstream fuses and breakers." (*Id.*). But even if electricity from a hypothetical triplex fault flowed toward Cude's house, Russell posits, it would have been grounded through a home-side ground wire and ground rod, preventing damage to the home's circuitry. (*Id.*). In summary, Russell reports that "all of the claims Mr. Winkfein has alleged including defects he says existed in the AEP [triplex] are completely wrong or are mere speculation, without evidence or support," or "scientifically flawed." (*Id.*).

## II.   DISCUSSION

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony in federal courts. FED. R. EVID. 702. AEP contends that Winkfein's background falls short of Rule 702's standards because he is not "qualified" to testify regarding the origin and cause of the fire that burned Cude's home. (Dkt. No. 13 at 5–10). AEP further argues that Winkfein's testimony fails Rule 702 because it is not "reliable." (*Id.* at 10–13). The Court agrees on both counts.

### A.   RULE 702 & THE *DAUBERT* STANDARD

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* explained that district courts play a "gatekeeping" role in determining whether expert testimony should be

presented to a jury.  509 U.S. 579, 597, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993).  In doing

so, district courts are governed by Rule 702:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if: (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable
> principles and methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

FED. R. EVID. 702.  The Fifth Circuit has distilled Rule 702 to first require district courts to assess

whether "the proffered witness is *qualified* to testify by virtue of his 'knowledge, skill, experience,

training, or education.'"  *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (emphasis added)

(quoting FED. R. EVID. 702).  And upon determining an expert witness is sufficiently qualified,

district courts are to "permit only *reliable* and *relevant* expert testimony to be presented to the

jury." *Id.* (emphases added) (citing *Daubert*, 509 U.S. at 590–93, 113 S.Ct. at 2795–96).

   As noted, AEP challenges Winkfein's expert designation on qualification and reliability

grounds, thus enabling the Court to assume his testimony is relevant.  It is important to further

note that Cude, as the party seeking admission, bears the burden of establishing by a preponderance

of the evidence that Winkfein's background and testimony satisfy Rule 702.  *See Mathis v. Exxon

Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

### B.   WINKFEIN'S QUALIFICATIONS TO TESTIFY REGARDING CAUSATION

   AEP first asserts that Winkfein is not qualified to testify regarding causation.  The Court

agrees.  The qualification requirement of Rule 702 holds two principles in tension.  On one hand,

an expert must be able to testify "in a *particular* field or on a *given* subject." *Id.* (emphases added).

On the other hand, "Rule 702 does not mandate that an expert be *highly* qualified in order to testify

about a given issue." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (emphasis added), *reh'g*

*denied*, 585 F.3d 823 (5th Cir. 2009).  Rather, "[d]ifferences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."  *Id.* (*Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798).

To properly balance these competing principles, the Fifth Circuit's precedents demonstrate that a district court must compare an expert's background with the "pertinent questions" to be answered by the expert's proposed testimony.  *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007).  Furthermore, a district court must be conscious of whether the pertinent questions are of a *general* or *specific* nature.  *See Huss*, 571 F.3d at 455; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156, 119 S.Ct. 1167, 1178, 143 L.Ed.2d 238 (1999) ("[T]he question before the trial court was specific, not general. The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case." (quotation omitted)).

General questions permit a relatively loose fit between an expert's background and the content of its testimony.  For instance, in *Wellogix, Inc. v. Accenture, L.L.P.*, the panel found that a software developer was qualified to testify regarding software programming language used by an oil-and-gas company despite the developer's lack of expertise in the oil-and-gas industry.  716 F.3d 867, 881–82 (5th Cir. 2013).  The panel reasoned that the software developer's testimony was reliable because the pertinent questions related to "*software* concepts and terms," not oil-and-gas terms.  *Id.* (emphasis added).  Similarly, in *Huss*, the panel was satisfied that an internist doctor was qualified to provide expert testimony disputing medical studies alleging that a certain drug caused cardiomyopathy, "as a general matter," despite the internist's lack of specialization in toxicology—like another expert in the case.  571 F.3d at 455.  In the end, the panel explained, the internist's testimony regarding medical literature on a certain drug was of a "general nature."  *Id.*

10

By contrast, specific questions demand a relatively tight fit between an expert's background and the content of their testimony.  The panel in *Huss* illustrated this principle by distinguishing its holding from a previous case, *Tanner v. Westbrook*, 174 F.3d 542 (5th Cir. 1999).  In *Tanner*, the *Huss* panel recounted, a doctor proffered testimony on whether a specific set of actions taken by a specific hospital staff caused a specific baby's cerebral palsy.  571 F.3d at 455 (citing *Tanner*, 174 F.3d at 547–48).  This question, explained the *Huss* panel, was "more specific" than whether medical literature established that a drug caused a condition.  *Id.*  And the specificity of the pertinent question in *Tanner* required the expert in that case to have a more tailored "personal experience that would validate his theory" than was required of the internist doctor in *Huss*.  *Id.*  Indeed, in *Tanner*, the panel found that, while the doctor was perhaps qualified to testify regarding the general proposition that "asphyxia causes cerebral palsy," that fact was not in dispute.  174 F.3d at 548.  Rather, the *Tanner* panel understood the pertinent question as "whether it is more likely than not that a baby with [the infant-plaintiff's] symptoms developed cerebral palsy as a result of the hospital's negligent treatment of her birth asphyxia."  *Id.*  And because the putative expert had "no background in studying the causes of cerebral palsy," did not "rely upon medical literature directly addressing the causation issue in this case," and had not "conducted . . . an exam [of the infant] nor reviewed the results of such an exam," he lacked "the kind of specialized knowledge required to testify regarding causation."  *Id.*  In other words, the specificity of the pertinent question required a more fitting background, and therefore any testimony the putative expert provided was "unreliable."  *Id.*; *see also Smith*, 495 F.3d at 227 (finding that a "polymer scientist" who had no training or expertise in "the tire industry" was not qualified to opine on the "cause of [a] particular [tire] tread separation"); *United States v. Cooks*, 589 F.3d 173, 180 (5th Cir. 2009) (finding that "white collar fraud investigator" who held a "general certification as a

fraud examiner" was not qualified to testify regarding "mortgage fraud" in light of his "sparse experience" in working on mortgage fraud cases); *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529–30 (5th Cir. 2015) (finding that a putative insurance industry expert's experience "as an in-house risk manager for various . . . companies," that is, "from the perspective of the insured," did not qualify him to testify regarding the propriety of an *insurance company's* adjustment of claims).

To bolster this principled treatment of putative experts based on the match between their background and the pertinent issue, the Fifth Circuit has recently cautioned district courts to not focus too stringently on an individual's title or any artificial label attached to their industry. District courts should refrain from "turn[ing] the expert-qualification process into a *battle of labels* where expertise is defined so narrowly that qualified experts are irrationally excluded from testifying." *Williams v. Manitowoc Cranes, LLC*, 898 F.3d 607, 625 (5th Cir. 2018) (emphasis added) (quotation omitted); *see also United States v. Wen Chyu Liu*, 716 F.3d 159, 168–69 (5th Cir. 2013) ("A lack of specialization should generally go to the weight of the evidence rather than its admissibility . . . ."). Instead, a district court is to probe a putative expert's background for "'sufficient indicia' that an individual will 'provide a reliable opinion' on a subject." *Williams*, 898 F.3d at 625 (quoting *Huss*, 571 F.3d at 455–56).

Here, the pertinent question addressed by Winkfein's proposed testimony is whether AEP's installation and maintenance of its electrical utility equipment outside Cude's residence was the cause and origin of the fire that burned Cude's home. Framed thus, the pertinent question falls within the "specific" category, as it narrows upon a specific type of investigation (fire causation and origin), a specific type of electrical equipment (that which is supplied and maintained by a utility company), and the exterior of a specific person's residence (Cude's). Like the doctor's

proposed testimony in *Tanner*, Winkfein's proposed testimony plainly purports to answer the pertinent question at its most specific level.[8]  And unlike the internist opining on the conclusions of medical literature in *Huss*, Winkfein's proposed testimony does not attempt to resolve causality by discussing faults in electrical utility equipment "as a general matter."  The Court must therefore determine whether there are sufficient indicia from Winkfein's background to reliably help the jury understand the cause and origin of the fire that burned Cude's home and how AEP's installation and maintenance of its electrical utility equipment played a role.  And the Court must do so without being overly concerned about Winkfein's formal title or industry label.

AEP makes two salient points in support of its argument that Winkfein is not qualified to proffer expert testimony.  First, AEP notes that Winkfein completely lacks any background whatsoever in fire causation and origin investigations.  (Dkt. No. 13 at 5).  AEP underscores the significance of this hole in Winkfein's background by pointing out that Winkfein admitted during his deposition to having no familiarity with the relevant fire investigation standards—the NFPA 921.  (Dkt. No. 13 at 7; Dkt. No. 13-1 at 42).  Second, AEP notes that Winkfein lacks any

---

[8]     In his Response to AEP's Motion, Cude attempts to frame Winkfein's proposed testimony in general terms, stating that Winkfein "contends that a faulty transformer, faulty grounding, and a malfunctioning fuse can create conditions that lead to a fire *of this type*."  (Dkt. No. 14 at 5) (emphasis added).  The Court disagrees that the focus of Winkfein's proposed testimony is so general.  For one thing, Winkfein does not once suggest that the fire at Cude's home was of any general "type."  *Compare, e.g., Justiss Oil Co. v. Kerr-McGee Ref. Corp.*, 75 F.3d 1057, 1065 (5th Cir. 1996) (describing a "chemical fire" expert's testimony that a small quantity of gasoline was "consistent with the *type of fire* that occurred" (emphasis added)); *United States v. Newman*, 235 F.3d 1339, 2000 WL 1672676, at *2 (5th Cir. 2000) (unpublished) (describing a fire investigator's lab analyses of a substance found at the scene of a fire which matched the "type of burn patterns" observed by the inspector); *Vicksburg Firefighters Ass'n et al. v. City of Vicksburg, Miss.*, 761 F.2d 1036, 1043 (5th Cir. 1985) (finding that a particular fire department's "captain makes all determinations and decisions regarding the *type of fire*, whether inflammables are involved, . . ." (emphasis added)).  Further, Winkfein's theories as to the cause and origin of the fire were clearly built upon a matrix of variables derived from the specific conditions at Cude's home.  For example, his theory regarding the origin of the fault in the triplex was built upon his belief that the triplex was overstretched, should have been replaced, and had perhaps succumbed to harsh weather conditions.  (Dkt. No. 13-1 at 30, 40).  By contrast, the "general" inquiry in *Huss* turned on the effect of a medicine as established in medical literature.  571 F.3d at 449.

background working with "high voltage" equipment used by electrical utilities.  (Dkt. No. 13 at 5).  AEP highlights this gap in Winkfein's background by noting his lack of familiarity with the relevant safety codes.  Namely, AEP posits that the relevant safety code is *not* the NEC[9]—which Winkfein relies on in part to arrive at his conclusions—but rather, the National Electrical Safety Code ("NESC").  (Dkt. No. 13 at 6).  Here, too, Winkfein admitted ignorance: not only has he not gone through the NESC, he does not even know the difference between the NEC and the NESC. (Dkt. No. 13-1 at 47).

To counter these arguments and observations about Winkfein's background and knowledge base, Cude states that Winkfein's qualifications derive from his practical experience and specialized knowledge in "the electrician industry."  (Dkt. No. 14 at 4).  This general background, argues Cude, provides Winkfein a basis "to opine in matters pertaining to the electrical faults at issue in this case."  (*Id.*).

Cude's counterargument misses the mark.  Although this case certainly requires some measure of expertise in "matters pertaining to electrical faults"—specifically those occurring in electrical utility equipment—such general analysis is insufficient to resolve the causation issue. What is missing is consideration of *other* plausible causes and origins of the fire that burned Cude's home—electrical or otherwise.  *See Bustamante v. Ponte*, 529 S.W.3d 447, 468 (Tex. 2017) (finding that causation in negligence actions requires exclusion of all "other plausible causes"); *Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 840 (Tex. 2010) (finding, in the context of a fire case, that an "expert's failure to explain or adequately disprove alternative theories of causation makes his or her own theory speculative and conclusory"); *see also Atlantic Specialty*

---

[9]   AEP points out that the NEC is not applicable to installations under the exclusive control of an electrical utility.  (Dkt. No. 13 at 6, 7; Dkt. No. 13-1 at 44).  *See* National Electrical Code, art. 90.2 ("This Code does not cover . . . [i]nstallations under the exclusive control of an electric utility . . . .").

*Ins. Co. v. Porter, Inc.*, No. 15-570, 2016 WL6126062, at *5 (E.D. La. Oct. 20, 2016), *aff'd*, 742 F. App'x 850 (5th Cir. 2018) ("[T]he NFPA [921] cautions that the investigator must be careful not to assume that abnormal electrical activity or damage (like arcing) is evidence that the fire was caused by electricity, because this damage can be both the cause of the fire or a result of the fire."). In other words, Cude's attempt to frame the pertinent issue addressed by Winkfein's proposed testimony as electrical faults in *general* ignores the *specific* issues here: fire cause and origin. The relevant issue for Rule 702 qualification purposes, then, is whether Winkfein's background in electrical work demonstrates expertise sufficient to conduct a proper fire cause and origin investigation.

The Court finds that Winkfein's background demonstrates little to no expertise in fire cause and origin investigation. He possesses no knowledge, skill, experience, training, or education in investigating and analyzing a fire scene to determine the cause and origin of a fire. Far from being an arbitrary label, expertise in fire cause and origin investigation has long been recognized as an independent field within the Fifth Circuit and throughout the federal system for purposes of Rule 702.[10]  In fact, Rule 702 disputes involving fires often turn on whether a fire-cause-and-origin investigator's experience within that general field is sufficient for the task at hand.  *See, e.g.*, *Suzlon*

---

[10]     *See, e.g.*, *Wilson*, 163 F.3d at 937–38 (recognizing an engineer's expertise in "the cause and origin of fires"); *Suzlon Wind Energy Corp. v. Shippers Stevedoring Co.*, 662 F. Supp. 2d 623, 664–65 (S.D. Tex. 2009) (finding that a "cause and origin expert" is "qualified under Rule 702 to testify about the cause and origin" of a fire in part because he "is certified as a fire and explosion investigator"); *Johnson v. Samsung Elec. Am., Inc.*, 277 F.R.D. 161, 166 (E.D. La. 2011) (giving significant weight to a putative expert's "extensive experience in fire investigation" for purposes of a Rule 702 analysis); *Aloe Coal v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987) (finding in part that a putative expert's lack of "knowledge or experience in determining the cause of equipment fires" rendered him unqualified to proffer expert testimony on the cause of a tractor shovel fire); *United States v. Gardner*, 211 F.3d 1049, 1054 (7th Cir. 2000) (recognizing "the field of fire cause and origin"); *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 640, 644–45 (8th Cir. 2009) (analyzing whether a "fire expert" reliably applied the NFPA 921); *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341–42 (11th Cir. 2013) (acknowledging the "industry" of "fire investigation" and noting that one expert, a "metallurgist," was "not . . . a cause and origin expert").

*Wind Energy Corp. v. Shippers Stevedoring Co.*, 662 F. Supp. 2d 623, 664–65 (S.D. Tex. 2009) (finding that a "cause and origin expert['s]" "general expertise" and "experience investigating fires caused by welding or hot work" qualified him to testify "about fire prevention procedures for hot work on different objects or structures").  Here, Winkfein's resume, while impressive for other reasons, fails to demonstrate that he possesses *any* scientific, technical, or other specialized knowledge in determining the cause and origin of fires.  As AEP points out, this gap in Winkfein's background is made most glaring by his lack of familiarity with the relevant standardized methodology—the NFPA 921.  Although the Fifth Circuit appears to have had no opportunity to consider the relevance of NFPA 921 in cases involving fire-cause-and-origin expert witnesses, at least the Fourth, Eighth, and Eleventh Circuits have relied upon the NFPA 921 in weighing expert testimony in cases involving fires.[11]  Regardless, Winkfein neglected to identify *any* standardized method—scientific or otherwise—that he applied when conducting his fire cause and origin "investigation."  This omission, in addition to undercutting the reliability of his testimony, *see infra*, illustrates how Winkfein's lack of qualifications bear on his *ability* to provide expert testimony regarding a fire's cause and origin.  The Court is therefore satisfied that Winkfein's background fails to demonstrate "sufficient indicia" that Winkfein will "provide a reliable opinion" on the cause and origin of the fire at Cude's home.  *Williams*, 898 F.3d at 625 (quoting *Huss*, 571 F.3d at 455–56).

---

[11]    *See Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 478 (4th Cir. 2005) (finding that an expert's reasoning was "inconsistent with the NFPA [921] standards"); *Presley*, 553 F.3d at 645 (8th Cir.) (finding that an expert failed to follow NFPA 921's standards); *United Fire & Cas. Co.*, 704 F.3d at 1342 (11th Cir.) (describing NFPA 921 as the "industry standard for fire investigation").  *But see Manuel v. MDOW Ins. Co.*, 791 F.3d 838, 845 (8th Cir. 2015) (describing NFPA 921 as a "reliable method" for determining fire causation, but "not the only method of fire investigation that [the Eighth Circuit] has approved" (citation and internal quotation omitted)).

Because the Court finds that Winkfein's background lacks sufficient indicators of expertise in fire cause and origin, it need not reach the issue raised by AEP concerning Winkfein's knowledge of and experience with "high voltage" electrical equipment belonging to a utility.  The Court notes, however, the Fifth Circuit has rejected the testimony of putative experts under analogous circumstances.  *See, e.g.*, *Weiser-Brown Operating Co.*, 801 F.3d at 529–30; *Cooks*, 589 F.3d at 180.  And at least one district court within the Fifth Circuit has found that a witness' certification as a master electrician and experience working with "low voltage" electrical systems is insufficient to qualify him as an expert where "high voltage" electrical systems are at issue. *Childs v. Entergy Miss., Inc.*, No. 2:08CV77, 2009 WL2508128, at *3 (N.D. Miss. Aug. 13, 2009), *aff'd*, 411 F. App'x 699 (5th Cir. 2011).  Here, AEP states that, as an electrical utility, it uses "high voltage power lines."  (Dkt. No. 13 at 2).  There is no evidence in the record that Winkfein has expertise with high-voltage systems, and neither Winkfein's reports nor his deposition expressly demonstrate he possesses any knowledge, skill, experience, training, or education with high voltage power lines.  Were the Court inclined to follow the lead of the district court in *Childs*— which was affirmed on appeal in an unpublished opinion—this omission would be sufficient to demonstrate Cude failed to meet his burden to show Winkfein is qualified here.  *See Mathis*, 302 F.3d at 459–60.

## C.   THE RELIABILITY OF WINKFEIN'S PROPOSED TESTIMONY IN GENERAL

AEP next argues that Winkfein's testimony in general is not reliable.  Here, too, the Court agrees.[12]

The Fifth Circuit has explained that *Daubert* requires district courts to assess the reliability of an expert's testimony by considering a list of "non-exclusive and flexible" factors:

---

[12]    Importantly, this holding is not limited to issues of causation.  Rather, it reaches all of Winkfein's proposed expert testimony.

> (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.

*Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (*en banc*) (citing *Daubert*, 509 U.S. at 593–95, 113 S.Ct. at 2796–97).  The goal is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co., Ltd.*, 526 U.S. at 152, 119 S.Ct. at 1176; *see also S.E.C. v. Life Partners Holdings, Inc.*, 854 F.3d 765, 775-76 (5th Cir. 2017) ("The reliability prong requires that an expert opinion be grounded in the methods and procedures of science." (quotation omitted)).  An expert's testimony "must be reliable at each and every step or else it is inadmissible."  *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).   In other words, "[t]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Id.* (citation omitted).  Importantly, "[w]here the expert's opinion is based on insufficient information, the analysis is unreliable."  *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an *analytical gap* between the data and the opinion proffered." (emphasis added)).

AEP attacks the reliability of Winkfein's proposed testimony by asserting that it does not rest upon scientific principles that can be tested and peer reviewed.  (Dkt. No. 13 at 4–5).  Namely, AEP points to Winkfein's lack of awareness of the NFPA and the NESC, which it claims renders

his opinions "scientifically unsound" and unreliable.  (*Id.* at 13).  AEP also identifies numerous inconsistencies and contradictions between his written reports and his deposition testimony, some of which are noted *supra*.  (*Id.* at 10-13).  Lastly, AEP contends that there is an "analytical gap" between the facts gathered by Winkfein and his theories.  (*Id.* at 12).

Cude counters that AEP's attack on Winkfein's methodology is irrelevant in light of the fact that AEP's own experts concluded it was impossible to "complete" an investigation.  (Dkt. No. 14 at 6).  Moreover, Cude argues, Winkfein relied on "published works"—the NEC and the LCH—to formulate his theories that AEP's failure to maintain its equipment could result in a "fire of this type."  (*Id.*).  Cude neglects to address the inconsistencies and contradictions in Winkfein's testimony identified by AEP.  (*Id.*).  Nor does he address AEP's assertion that there is an analytical gap in Winkfein's reasoning.  (*Id.*).

The Court finds that the proposed expert testimony of Winkfein is not reliable.  As it relates to his causation analysis, AEP is correct that Winkfein's testimony is devoid of any indication that he applied *any* investigatory principles when determining causation, let alone one that is "scientific," "peer reviewed," or can be "tested."  It is unclear why Cude thinks Winkfein's lack of a guiding methodology is rendered irrelevant by the fact that AEP's own experts could not determine ultimate causation.  For starters, AEP's experts *were* able to determine—through a scientific investigation—that the fire originated in the interior of Cude's home.  By comparison, Winkfein ruled out that possibility simply because of his confidence in the functionality of the interior electrical equipment that he installed.  As well, Winkfein's lack of a methodology is obvious: he neglected to test any relevant materials, examine fire patterns, or perform current-flow calculations.  As the reports from AEP's experts and the NFPA 921 standards demonstrate, these

procedures are possible and important.[13]   Without these efforts, it is impossible for the Court to

say that Winkfein had "[]sufficient information" at any step, *Paz*, 555 F.3d at 388, much less

"every step" of his analytical process.   *Knight*, 482 F.3d at 355.   Lastly, AEP is correct that there

are significant "analytical gaps" in Winkfein's proposed testimony, such as the cause of the

triplex's fault (did the weather contribute or not?), the timing of when the triplex faulted (before

or during the fire?), the neutralizing effect, if any, of the home-side ground and AEP's ground, and

the reasons, if any, for his certainty as to how AEP's multiple fuses failed.

Winkfein's proposed testimony also proves unreliable when purporting to address the

relevant standard-of-care and AEP's breach thereof.   Namely, Winkfein's ignorance of the NESC

demonstrates that his assessment of AEP's installation and maintenance of its electrical utility

equipment was off target from the beginning.   Adopted by Texas in 1949, the NESC has long been

recognized in Texas tort cases involving power utilities.   *See, e.g.*, TEX. UTIL. CODE § 181.045(a)

("A municipal electric utility shall construct, operate, and maintain its transmission lines and

distribution lines along highways and at other places in accordance with the national electrical

safety code."); *City of Brady, Tex. v. Finklea*, 400 F.2d 352, 356 (5th Cir. 1968) ("The provisions

of the [NESC] provide broad minimum requirements for electric companies to follow.   Evidence

of compliance or non-compliance with the Code is properly considered in determining if the

construction of an electrical distribution system meets the common law standard of care under a

given set of facts."); *Traxler v. Entergy Gulf States, Inc.*, 376 S.W.3d 742, 744 (Tex. 2012)

(discussing the legislative background of § 181.045 and finding a narrow, statutorily prescribed

situation—inapplicable here—in which the NESC does *not* apply).   And even if the LCH provided

---

[13]     For an excellent discussion of the NFPA 921's thorough methodology, and how it applies to cases involving putative expert witnesses in fire cause and origin cases, see *Atlantic Specialty Ins. Co.*, 2016 WL6126062, at *5–7.

some value here,[14] it is clear that Winkfein's testimony as to the applicable standard of care and breach relies in large part upon the NEC, which is expressly inapplicable to utilities such as AEP. Having misapprehended the applicable standard of care, Winkfein's testimony is not able to inform a jury on this topic.

**III.    CONCLUSION**

In light of the foregoing, the Court finds that Winkfein's testimony is not reliable and thus should be excluded pursuant to Rule 702 and the standards elucidated in *Daubert*.  AEP's Motion is therefore **GRANTED**.

It is SO ORDERED.

SIGNED this March 1, 2021.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**

---

[14]     It is worth noting that neither party discusses the significance of the LCH, and the Court has found no case applying Texas law which even mentions it.